FILED IN CHAMBERS
U.S.D.C. - Atlanta

SEP 06 2018

James N. Hatten, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ESTATE OF JAMES WILLIAMS; ASASA
RASHEED WILLIAMS; FAROD
WILLIAMS; AASIR WILLIAMS; and
BASHIR NATHANIEL AULD,

          Plaintiffs

v.

DOUGLAS COUNTY; MIKE SHULER,
individually and in his
official capacity; MARK
WARDLAW, individually and in
his official capacity; KENNY
JERMANE TURNER, individually
and in his official capacity;
PHIL MILLER, individually and
in his official capacity; and
TIM POUNDS, in his official
capacity,

          Defendants

CIVIL ACTION NO.
1:16-CV-2913-ODE

## ORDER

This Section 1983 action is before the Court on multiple motions: 1) Plaintiffs' Motion to Compel [Doc. 123] filed on October 19, 2017; 2) Plaintiffs' Motion for Partial Summary Judgment [Doc. 128] filed on December 3, 2017; 3) the "Law Enforcement Defendants'" (Deputy Sheriff Kenny Jermane Turner, Sheriff Tim Pounds and former sheriff Phil Miller) Motion for Summary Judgment [Doc. 132] filed on December 4, 2017; 4) the "Firefighter Defendants'" (Douglas County and Mark Wardlaw) Motion for Summary Judgment [Doc. 134] filed on December 4, 2017; and 5) the Firefighter Defendants' Motion to File Supplemental Brief [Doc. 165] filed on January 30, 2018. In addition, the Firefighter and Law Enforcement Defendants filed Notices of Objections to Plaintiffs' Filing of External Media [Docs. 145, 155] on December 20, 2017 and January 5, 2018. The Court

will address all pending motions and the Defendants' evidentiary objections in this Order.

For the reasons stated below Plaintiffs' Motion to Compel [Doc. 123] is DISMISSED AS MOOT; Plaintiffs' Motion for Summary Judgment [Doc. 128] is DENIED; the Law Enforcement Defendants' Motion for Summary Judgment [Doc. 132] is GRANTED; the Firefighter Defendants' Motion for Summary Judgment [Doc. 134] is GRANTED; and the Firefighter and Law Enforcement Defendants' objections to Plaintiffs' external media filing [Docs. 145, 155] are SUSTAINED, and the external media submission [Doc. 135] is STRICKEN from the record.

## I.   PRE-SUMMARY JUDGMENT MOTION TO COMPEL

Plaintiffs filed a motion on October 19, 2017 following the close of discovery on October 3, 2017 asking that Defendants Phil Miller and Tim Pounds[1] ("Miller" and "Pounds") be compelled to respond to requests for production propounded in September 2017 or in the alternative, that discovery be extended so that these Defendants "will be required to participate in [d]iscovery" [Doc. 123 at 2]. Plaintiffs originally served Miller and Pounds' counsel with the requests for production at issue here on September 6, 2017. However, at that time Miller and Pounds had not received service of process and thus were not yet parties to the case. On September 7, 2017 one day after the requests for production were sent to Miller and Pounds, Plaintiffs sent a request for records to the Douglas County Sheriff's Office (the "Sheriff's Office") pursuant to the Georgia Open Records

---

[1]Tim Pounds is listed on the docket as "Movant"; however, he was properly served on September 27, 2017 [Doc. 110] and is now a proper defendant in this case. Plaintiffs' and Defendants' motions make clear that Tim Pounds is only being sued in his official capacity. The Clerk is DIRECTED to correct the docket accordingly.

2

Act seeking identical documents as those sought in the September 6, 2017 requests sent to Miller and Pounds. The Court then on September 8, 2017 ordered Miller and Pounds to be served with process, explaining that the previous discovery requests were premature [Doc. 102 at 10].

After the Court's Order of September 8, 2017, Plaintiffs served Miller on October 5, 2017 and Pounds on September 27, 2017 after both defendants declined to waive service (Miller was thus served slightly outside the discovery period which ended October 3, 2017). Because both Defendants were served at the end of or after the discovery period, they argue in response to Plaintiffs' motion that they cannot be required to respond to the previously propounded discovery requests.

After serving Miller and Pounds, Plaintiffs received a response to their Open Records Act request sent to the Sheriff's Office. Plaintiffs argue that the received response is inadequate, but nonetheless filed their Partial Motion for Summary Judgment (and responded to Defendants' motions for summary judgment) with no further mention of the issue. As both parties' summary judgment motions have been filed and responded to, the Court finds this Motion to Compel [Doc. 123] to be MOOT and DISMISSES it as such.

The Court notes to prevent future confusion that at the time of Williams' death, Miller was the Douglas County Sheriff. However, in January 2017 Tim Pounds became Sheriff of Douglas County, and is thus substituted automatically in place of Miller where Miller is being sued in his official capacity as Sheriff of Douglas County. See Fed. R. Civ. P. 25(d). It appears, however, that Plaintiffs are also suing Miller in his individual capacity. Thus, Miller remains a

3

party to this suit in his individual capacity, and the Law Enforcement Defendants specify that their summary judgment motion is on behalf of Miller *and* Pounds. In sum, where the Court refers to the "Sheriff" it means Pounds and the Office of the Sheriff (the Sheriff in his official capacity). Where the Court refers to the Sheriff in his individual capacity or to Miller, it means Miller in his individual capacity.

## II. SUMMARY JUDGMENT PROCEDURAL AND FACTUAL BACKGROUND

### A. The Parties and Claims at Issue

Throughout this case there has been confusion about which parties and claims are proper, and thus the Court clarified at the end of each Order it issued in this case the claims that remained. By way of brief background (undisputed facts discussed in detail in section below) according to the Complaint, on the night of December 17, 2014, Plaintiff Asasa Rasheed Williams ("Mrs. Williams") called 911 for medical assistance because her husband, James Williams ("Williams"), was having a seizure. Firefighters Mike Shuler ("Shuler") and Mark Wardlaw ("Wardlaw") responded and allegedly became physical with Williams. Defendant Turner, a Deputy Douglas County Sheriff, then arrived as backup and allegedly tasered Williams three times. Defendants Shuler, Wardlaw, and Turner then allegedly seized and physically restrained Williams, thereby causing injury to his head and brain, which Plaintiffs allege ultimately resulted in his death [Compl., Doc. 1].

On August 10, 2016, Williams' estate, Mrs. Williams, and Williams' three children (collectively, "Plaintiffs") brought suit against: (1) Shuler, Wardlaw, and Turner in their individual and official capacities; (2) Douglas County, Douglas County Sheriff's

4

Office, and Douglas County Fire Department; and (3) then-Sheriff Phil Miller in his individual and official capacity [Id.].² Plaintiffs initially pled thirteen claims: (1) Fourth Amendment violations pursuant to 42 U.S.C. § 1983; (2) excessive force pursuant to § 1983; (3) Fourth Amendment Monell liability against "state entities and supervisors"; (4) Fourth Amendment deliberate indifference against "state entities, supervisors, state actors"; (5) violation of Americans with Disabilities Act and the Rehabilitation Act; (6) negligence; (7) battery; (8) false imprisonment; (9) wanton conduct; (10) intentional infliction of emotional distress; (11) survival injury; (12) wrongful death; and (13) vicarious/respondeat superior/punitive liability [Id.]. Plaintiffs sought damages and injunctive relief [Id.]. On October 6, 2016, Defendant Douglas County filed its answer [Doc. 14]; on October 7, 2016, the Douglas County Sheriff's Office and Defendant Turner filed their answer [Doc. 15]. On January 6, 2017, Douglas County Fire Department and Defendant Wardlaw filed their answers [Docs. 28, 29].

On January 9, 2017, the Court granted a largely unopposed Partial Motion for Judgment on the Pleadings filed by Douglas County, the Sheriff's Office, and Defendant Turner [Docs. 21, 32]. On February 15, 2017, the Court granted in part and denied in part a Motion to Dismiss filed by the Fire Department and Defendant Wardlaw [Docs. 30, 41]. In the Court's Order of February 15, 2017, the Court explained that following its decision the case stood as follows:

---

²Plaintiffs also brought suit against Taser International, Inc., but voluntarily dismissed these claims with prejudice [Doc. 17].

(1) all claims were dismissed against both the Douglas County Sheriff's Office and the Douglas County Fire Department as neither is a legal entity capable of being sued; (2) Douglas County remained as a defendant, but could not be liable for any actions taken by the Sheriff, his Office, or his Deputy--Defendant Turner; (3) Mike Shuler remained as a defendant, individually and in his official capacity, pending next steps as to his death[3]; (4) Mark Wardlaw remained as a defendant only in his individual capacity, and only as to the claims for Fourth Amendment violations and excessive force pursuant to Section 1983, Fourth Amendment <u>Monell</u> liability, and Fourth Amendment deliberate indifference[4]; (5) Deputy Sheriff Kenny Jermane Turner and Sheriff Miller remained as defendants in their individual and official capacities, but could only be liable in their official capacities for the alleged Americans with Disability Act ("ADA") and Rehabilitation Act ("RA") violation; and (6) Plaintiffs could seek only damages and not injunctive relief associated with their claims [Doc. 41 at 11].

---

[3]Plaintiffs failed to properly serve Shuler's non-party representative according to the requirement of Federal Rule of Civil Procedure 4(e) as detailed in this Court's Order of January 9, 2017 [Doc. 32]. Thus, neither Shuler nor his estate is a proper party to this case and the Court will not consider claims against either any further.

[4]Plaintiffs pled <u>Monell</u> liability against "state entities and supervisors" and deliberate indifference against "state entities, supervisors, actors" [Doc. 1]. However, there is no evidence to indicate Defendant Wardlaw is such an "entity," "supervisor," or "actor." The same is true for the <u>Monell</u> and deliberate indifference claims against Turner (discussed in more detail in body of Order below). Thus, though those claims remained as of the Court's January 9, 2017 Order, they are no long viable in this case and are DISMISSED.

6

The Court did not dismiss Defendants where their inclusion was simply redundant but Defendants did not ask to be dismissed precisely for that reason; for example, where Turner and Miller were both sued in their official capacities for ADA violations (both are effectively ways to sue the Sheriff because the Douglas County Sheriff's Office is not an entity subject to suit in federal court as discussed in the Court's Order of January 9, 2017). However, the Court will point out those redundancies in this Order to streamline discussion.

Plaintiffs now move for partial summary judgment [Doc. 128] on their claims against Turner for excessive force and deliberate indifference; against the "supervising sheriffs," and Office of the Sheriff for failure to train/supervise/investigate/discipline and deliberate indifference to the "constitutional rights of citizens"; and against Turner and the Sheriff (in their official capacities) for violation of the ADA and RA. Though Plaintiffs appear to move for summary judgment on a claim for deliberate indifference to medical needs, the Complaint only mentioned deliberate indifference in the context of a Monell/supervisory liability claim. Thus, the Court will not now consider Plaintiffs' claim for deliberate indifference to medical needs. The Court also here notes that Plaintiffs in the Complaint listed Monell liability (for a pattern or custom of violating citizens' rights and a failure to train/supervise/discipline) and deliberate indifference based on a failure to train (what this Court here terms "supervisory liability for deliberate indifference/failure to train" for clarity) as two separate claims, and Defendants discuss them separately. The Court will therefore also discuss these claims as separate, but finds them to be almost entirely restatements of the same claim.

7

Defendants (both Law Enforcement and Firefighter) state that they move for summary judgment on all claims. Specifically, the Law Enforcement Defendants move for summary judgment on Plaintiffs' federal law claims for violation of Williams' Fourth and Fourteenth Amendment rights (unreasonable search and seizure, excessive force, and failure to intervene); entity liability claims (Monell liability and supervisory liability for deliberate indifference/failure to train); ADA and RA claims; and state law claims for negligence, battery, false imprisonment, wanton conduct, intentional infliction of emotional distress, and respondeat superior against the Sheriff (wrongful death and survival injury are not separate tort claims but theories for the recovery of damages).

Because Plaintiffs pled Monell liability against "state entities and supervisors" and deliberate indifference/failure to train against "state entities," "supervisors," and "state actors," the Court was unable to previously determine if Plaintiffs pled Monell liability and deliberate indifference against Turner. The Court noted in its Order of September 8, 2017 that "without evidence to indicate whether Defendant [Turner] is or is not such an 'entity,' 'supervisor,' or 'actor,' the Court cannot yet say whether these claims apply to him" [Doc. 102 at 4 nn.3-4]. In his response (the Law Enforcement Defendants' Response, Doc. 147) to Plaintiffs' Motion for Summary Judgment, Turner asserts that he is neither a state entity nor a state supervisor or actor, and thus the Monell and supervisory liability claims for deliberate indifference/failure to train asserted against him are subject to dismissal as a matter of law. Plaintiffs provide no further argument on this matter in their summary judgment motion or reply to the Law Enforcement Defendants'

8

response.   Thus, the Court agrees with Turner and the Law Enforcement
Defendants.

The Complaint clearly pleads deliberate indifference in terms of
supervisory or entity liability, and not individual liability for
deliberate indifference to medical needs.   There is simply no claim
for deliberate indifference in this case that would be applicable to
individual liability, and as Turner is not a state entity,
supervisor, or actor as Plaintiffs use those terms (to indicate an
organization, as is made clear by the Complaint), summary judgment is
GRANTED for Turner to the extent Plaintiffs asserted Monell and
supervisory liability claims for deliberate indifference/failure to
train against him.   However, Sheriff Pounds (sued in his official
capacity) is a Defendant, and thus the supervisory and Monell claims
against the Sheriff are viable.   Sheriff Pounds was substituted for
Sheriff Miller where Miller was sued in his official capacity, so the
Court will not discuss Monell or supervisory liability against Miller
(or Turner) but will discuss those claims against Pounds in his
official capacity.   Similarly, Plaintiffs' RA and ADA claims may only
proceed against the Sheriff in his official capacity, and thus the
Court will only discuss those claims as against Sheriff Pounds as
well.   Sheriff Pounds was substituted for Miller and there is no need
to discuss these claims as against Turner in his official capacity
because both suing Turner and Miller (now Pounds) in their official
capacities are ways to sue the Sheriff, as the Douglas County
Sheriff's Office is not a legal entity capable of suit.   Early on in
this litigation Plaintiffs agreed that the ADA and RA claims against
Turner in his official capacity were "subsumed" [Doc. 24 at 3] by the
claims against the Sheriff, here Sheriff Pounds after his

9

substitution for Sheriff Miller in his official capacity. Thus to the extent ADA/RA claims are asserted against Miller and Turner, summary judgment is GRANTED for those Defendants on Plaintiffs' ADA/RA claims. The ADA/RA claims may only proceed as against the Sheriff (Sheriff Pounds in his official capacity).

The Firefighter Defendants also move for summary judgment on all claims asserted against them. Specifically, the Firefighter Defendants move for summary judgment on Plaintiffs' Monell and supervisory liability for deliberate indifference/failure to train claims against Douglas County; ADA and RA claims against Douglas County; state law claims (described above) against Douglas County; and excessive force and supervisory liability claims against Wardlaw for deliberate indifference/failure to train. Here again although Plaintiffs pled Monell liability against "state entities and supervisors" and deliberate indifference against "state entities," "supervisors," and "state actors," Plaintiffs provide no analysis as to how Wardlaw falls into one of those categories clearly meant in the context of Plaintiffs' Complaint to represent an organization, not an individual. Thus, the Court finds that no claim for Monell liability or supervisory liability for deliberate indifference/failure to train can be maintained against Wardlaw as a matter of law, and to the extent Plaintiffs asserted such claims against Wardlaw, summary judgment is GRANTED for Wardlaw at this time. Those claims may proceed, however, against Defendant Douglas County just as they may proceed against Sheriff Pounds.

Upon review of all the claims upon which Defendants move for summary judgment, the Court finds that Defendants did properly move for summary judgment on *all* remaining claims--thus in GRANTING

10

Defendants' motions for summary judgment for the reasons stated below there remain no viable claims to proceed in this case.

## B. Evidentiary Issues and Additional Authority

On December 7, 2017, Plaintiffs filed a "Notice of Manual Filing of External Media" [Doc. 135] in support of their Partial Motion for Summary Judgment [Doc. 128].    The Firefighter and Law Enforcement Defendants filed Notices of Objections [Docs. 145, 155] to Plaintiffs' external media filing, arguing that the external media is a 203 page PowerPoint presentation that includes Plaintiffs' counsel's impressions of the case, self-serving statements, and unverified transcriptions by Plaintiffs' counsel of various audio recordings, as well as unverified information from the internet. Defendants argue many of the slides contain photographs or audio recordings without foundation and include editorialized content and commentary from Plaintiffs' counsel.   Defendants in sum argue that this filing was an attempt by Plaintiffs to skirt the Federal Rules of Civil Procedure and Federal Rules of Evidence.

Plaintiffs in response [Doc. 159] argue that every "material" in the PowerPoint is capable of being offered at trial and everything in the PowerPoint was already discussed in Plaintiffs' briefings. Plaintiffs argue the PowerPoint only contains materials given to Plaintiffs by Defendants, making them self-authenticating.   Further, Plaintiffs argue everything in the PowerPoint has already been provided to Defendants multiple times.   In sum, Plaintiffs argue the PowerPoint is simply a repackaging of admissible evidence in a way that should be helpful to the Court.

Having reviewed the PowerPoint, the Court agrees with Defendants.   While a few slides do simply contain audio recordings it

appears were played for witnesses (and therefore authenticated) during various depositions, many slides also contain commentary and counsel's analysis--some of the commentary even borders on argument. The Court agrees with Defendants that this was a wholly inappropriate attempt by Plaintiffs to have one more chance to provide argument in violation of the Local and Federal Rules of Civil Procedure. The admissible and wholly inadmissible content is intertwined in the PowerPoint, and the Court will not now go through the lengthy PowerPoint and pick out the slides or parts of slides that are acceptable. Instead, the Court STRIKES the PowerPoint [Doc. 135] from the record and will not consider it further in deciding the other motions at hand.

After filing their Motion for Summary Judgment [Docs. 132; 134], the Firefighter Defendants filed a Motion to File Supplemental Brief Citing Additional Authority [Doc. 166], and the Law Enforcement Defendants filed a Notice of Supplemental Authority [Doc. 167]. Neither the Motion to File Supplemental Brief nor the Notice of Supplemental Authority has been objected to by Plaintiffs. Thus, the Court GRANTS the Motion to File Supplemental Brief [Doc. 166] and considers that brief and the additional authority contained in the Notice of Supplemental Authority [Doc. 167] going forward in this case.

## C. **Summary Judgment Standard**

The Court will grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the

12

> pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citation omitted). Once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. Id. at 325. The non-moving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial." Id. at 324 (internal quotation marks and citation omitted).

To be material, a fact must be identified by the controlling substantive law as an essential element of the non-moving party's case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (internal quotation marks and citation omitted). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005). Moreover, the Local Rules specify that a respondent to a summary judgment motion must directly refute the movant's facts with *specific* citations to the evidence. Unless the respondent "specifically informs the court to the contrary," the court will "deem the movant's citations supportive of its facts." LR 56.1B(2)(a), NDGa.

In so reviewing the record, the Court must construe the facts and make all reasonable inferences in favor of the non-moving party.

13

<u>Anderson</u>, 477 U.S. at 255; <u>Reese v. Herbert</u>, 527 F.3d 1253, 1271 (11th Cir. 2008).

### D.   **Undisputed Facts**

The following facts are undisputed unless otherwise indicated, and are taken in majority from Defendants' Statements of Material Facts [Docs. 132-2; 134-2] as Plaintiffs make few specific objections supported by citations to the evidence as required by the Local Rules.   <u>See</u> LR 56.1B(2)(a)(2), NDGa.

On December 17, 2014 at 4:23 a.m., Asasa Rasheed Williams ("Mrs. Williams") called 911 stating that her husband, James Williams ("Williams"), appeared to have had a seizure but was no longer actively seizing, and she required assistance [Doc. 134-2 ¶¶ 1, 3]. Mrs. Williams also informed the 911 operator that Williams had a seizure 11 weeks earlier, but was not diagnosed as epileptic and had been coming down with the flu [<u>Id.</u> ¶ 3; Doc. 139-27]. Douglas County Fire/Emergency Medical Services (the "Fire Department," or "EMS") were dispatched to the Williams residence one minute later to respond in reference to a "seizure," and advised that a male in his 40s was "no longer seizing at this time" [Doc. 132-2 ¶ 34]. Mrs. Williams continued to speak to the 911 dispatcher [Doc. 134-2 ¶ 2]. Mrs. Williams informed the dispatcher that it appeared Williams was coming out of the seizure and getting back to normal, and the dispatcher offered to stay on the line with Mrs. Williams until the Fire Department arrived [Doc. 132-2 ¶ 3; Doc. 134-2 ¶¶ 3-4]. The dispatcher instructed Mrs. Williams to "contain," but try not to touch Williams, because he would likely be confused and out of breath when he came out of the seizure [Mrs. Williams Dep., Doc. 156 at 70-71]. The dispatcher continued to provide advice, but at some point

before EMS arrived Mrs. Williams and the dispatcher ended their call [Doc. 134-2 ¶ 5].

Williams was upstairs in their house when Mrs. Williams called 911, and had been since the beginning of his seizure (the "incident"). While still waiting for EMS to arrive, he entered a small bathroom [Id. ¶ 12]. Having little control over his body, Williams fell toward the wall of the bathroom and hit his head [Id.]. He also knocked items off the counter and fell onto the sink [Mrs. Williams Dep., Doc. 156 at 64-65]. Mrs. Williams was concerned Williams would hurt himself, and described Williams in her deposition as "swaggering," "flopping," or "slump[ing]" toward the bathroom wall [Mrs. Williams Dep., Doc. 156 at 64-65, 71, 138].

Mrs. Williams worried about her ability to contain Williams, and did not want him leaving the room he was in [Mrs. Williams Dep., Doc. 156 at 64-65]. Though she did not fear he would be violent toward her and asserted in her deposition that he never struck her, she remained "scared," of what to do if he tried to get out the door, for example [Id. at 72]. Mrs. Williams tried to inform Williams he had a seizure, but she could tell he was not understanding [Id. at 71]. When Williams started moving toward the door of the room, Mrs. Williams yelled for her twenty-year old son, Bashir Auld ("Auld") and asked him to call 911 back and ask them to "hurry up," because she did not know how much longer she could contain Williams [Id.].

At that point Williams began making a loud and "strange" noise Mrs. Williams had not heard before, and Auld called 911 as instructed by his mother [Doc. 134-2 ¶ 6; Auld Dep., Doc. 157 at 21]. Auld told the dispatcher he needed help because "[Williams] got up" and his mother could not "control him"; he was "acting crazy" and making a

15

strange noise and walking around, but was not being violent [Docs. 132-2 ¶ 6; 134-2 ¶ 7]. Auld explained Williams was just being "hysterical" and confirmed with the dispatcher that medical help was quickly on the way [Docs. 132-2 ¶ 5; 134-2 ¶ 8]. The dispatcher's notes summarized Auld's call as a request for help restraining Williams [Doc. 139-27 at 1], and advised Engine 7 Rescue 9, which was on its way to Williams' residence that Williams was "walking around and acting very strange . . . they're not able to control him but they're advising he's not being violent" [Doc. 132-2 ¶ 6].

While on the line with Auld the dispatcher was able to hear the noise in the background, and Auld confirmed it was Williams who was making that noise [Doc. 134-2 ¶ 8]. The dispatcher advised Auld that she was going to get a sheriff's deputy started to help EMS get control over Williams, to which Auld responded: "Yeah. Go ahead and do that" [Id. ¶ 7]. The dispatcher then radioed the Douglas County Sheriff's Office (the "Sheriff's Office") advising that the Fire Department required assistance based on a 911 call about a male who came out of a seizure but was up "walking around acting strange making weird noises," and was "getting pretty rowdy" [Id. ¶ 8]. The Sheriff's Office responded: "What is he belligerent" and the dispatcher explained "they couldn't tell if he's going to be combative" [Doc. 151 ¶ 8]. The dispatcher later radioed the Sheriff's Office again advising that the Fire Department was on the scene but needed help restraining Williams; the Sheriff's Office replied that their unit was already on the scene [Doc. 132-2 ¶ 9].

Mrs. Williams stated in her deposition that she expected the Fire Department to assist her in containing Williams because she was trying not to touch him based on her understanding of seizures and

16

the instructions of the dispatcher [Mrs. Williams Dep., Doc. 156 at 96]. Mrs. Williams was worried for Williams' safety and that he could hurt himself because he had fallen or stumbled several times into the walls of the house [Id. at 79-80, 140; Doc. 132-2 ¶ 12]. She testified that she was concerned about the falls because Williams fell like "dead weight," and "[y]ou could possibly hurt your head" [Mrs. Williams Dep., Doc. 156 at 80]. But Mrs. Williams testified Williams had no visible injuries prior to the Fire Department arriving [Id. at 140].

Mrs. Williams stated that Williams was not capable of picking things up due to a lack of motor control, but he did push items down, including almost pushing the large television in the master bedroom off the wall [Id. at 116-17; Doc. 132-2 ¶ 14]. Mrs. Williams stated that she tried to block him from doing so because she did not want him to be around anything "that could possibly hurt someone" [Mrs. Williams Dep., Doc. 156 at 76]. She did not, however, feel she was in danger according to her deposition testimony [Id. at 80].

At some point prior to the Fire Department's arrival, Williams lost control of his bladder and bowels and Mrs. Williams accidentally removed his shirt when holding onto him to keep him from falling; Mrs. Williams felt Williams wanted to "get away" [Doc. 132-2 ¶ 15; Mrs. Williams Dep., Doc. 156 at 78-79]. Mrs. Williams described the scene prior to the firefighters arrival as follows: "[L]ike, he had feces all over him. After he threw, like, pushed stuff off the vanity, he laid down. He got back up, and then went to the toilet" [Mrs. Williams Dep., Doc. 156 at 156]. At that point, Mrs. Williams thought the firefighters could help her "control" Williams [Id.].

17

Douglas County paramedic Mike Shuler ("Shuler") and EMT Mark Wardlaw ("Wardlaw") from "Rescue 5," both with more than 30 years of experience, were to first to arrive at Williams' residence[5] [Doc. 132-2 ¶ 17].   Wardlaw testified in an interview with the Georgia Bureau of Investigations that when he arrived on the scene he could hear Williams making noise upstairs [Doc. 132-2 ¶ 18].   Shuler and Wardlaw went upstairs, where they found Williams sweating, wearing only jogging pants, and covered in his own feces [Id. at 20].   Williams was banging his head into the walls and falling when they approached him, and at one point he fell into a bathroom tub [Id. at 20-21].

While it is unclear if Shuler or Wardlaw were holding or pushing Williams at the time while trying to contain him, it is undisputed that soon after Shuler and Wardlaw arrived Williams fell hard into a wall, breaking the dry wall [Id.; Auld Dep., Doc. 157 at 30-34, 53]. Auld testified he saw Williams hit the dry wall and that Williams did not fall but was tackled; Wardlaw testified that Williams fell on his own into the drywall.   Williams cut his head and was bleeding [Doc. 132-2 ¶ 23].   The parties dispute whether Williams was "violent" to himself, but it is undisputed that he was moving around and falling, making it difficult for Wardlaw and Shuler to assess the situation [Id. ¶ 24].   And although the call to the Fire Department informed Wardlaw and Shuler that Williams had a seizure, upon arrival at the scene Wardlaw and Shuler were not sure what medically was the issue with Williams, because he seemed to no longer be actively seizing and

---

[5]The Court refers to Wardlaw and Shuler as firefighters and the Firefighter Defendants because they drive a fire engine and report to a fire house.   Plaintiffs and Defendants also use the terms firefighters or fire department.

was moving around while making an odd noise [Id. ¶ 26; Doc. 134-2 ¶ 13].   Soon after Shuler and Wardlaw's arrival, Williams left the master bedroom and entered a child's bedroom, which was empty [Mrs. Williams Dep., Doc. 156 at 154].

Wardlaw did not believe Williams presented a threat, but he and Shuler did fear Williams could hurt himself further and could have hurt them if allowed to continue moving freely [Doc. 132-2 ¶ 27].   To prevent Williams from injuring himself further, Shuler attempted to put Williams in a "Full Nelson," a type of restraint of the arms and legs [Id. ¶ 28].   Shuler failed to restrain Williams, however, who continued to move his arms and feet and make it difficult for Wardlaw and Shuler to begin treatment [Id. ¶ 29].   Shuler and Williams fell to the floor as Williams continued to resist assistance [Doc. 134-2 ¶ 22].   Wardlaw tried to help Shuler by holding Williams' legs so that treatment could begin, but left the room due to the strong smell of feces [Id. ¶ 30; Doc. 132-2 ¶ 23].

Whether intentional or unintentional, passive or active, it is undisputed that Williams resisted receiving treatment and remained a threat to himself [Doc. 134-2 ¶ 24].   Wardlaw described Williams as "just out of control" [Wardlaw Dep., Doc. 136 at 14-15].   While Shuler was still attempting to restrain Williams, Deputy Turner ("Turner") from the Douglas County Sheriff's Department arrived on the scene and attempted to assist [Doc. 134-2 ¶ 25].   Mrs. Williams told Turner that Williams had a seizure, but Turner testified he did not know Williams had a seizure, and in any case, that would not have changed the outcome of his actions because he assessed the situation upon entering the house [see Mrs. Williams Dep., Doc. 156 at 73; Turner Dep., Doc. 138 at 158].   Turner noticed a hole in the wall and

19

feces on the floor [Doc. 132-2 ¶ 33]. Turner believed Shuler could be in danger and yelled "hey" repeatedly at Williams, and asked him to "stop" and relax [Id. ¶¶ 35, 37]. Both Turner and Shuler attempted to put Williams' hands behind his back but could not get a good grip on him because he was shirtless and sweating [Id. ¶ 38]. Turner ordered Williams to calm down or he would use his taser [Doc. 134-2 ¶ 26]; he yelled "you are about to get tased," and "turn around" [Id. ¶ 40]. Turner commanded Williams to "stop acting wild," and "turn around" three more times, but Williams did not comply [Id. ¶¶ 41-42].

Turner then deployed his taser [id. ¶ 44] and Williams collapsed onto a bed [id. ¶ 45]. Turner once again ordered Williams to "stop moving," and once again whether intentional or not, Williams did not comply--instead, while attempting to get up from the bed he hit his head and continued to move his arms [Doc. 132-2 ¶¶ 47-48]. Wardlaw testified that Williams' continued movement made it so he could not begin treatment [Wardlaw Dep., Doc. 136 at 88]. Though Williams was not being violent and was in fact retreating from the officers, he continued to disobey Turner's commands, and began moving toward a dresser [Id. ¶¶ 50-51]. Turner deployed his taser a second time, and Williams fell between the bed and dresser [Id. ¶ 51]. Turner still could not get control of Williams and again instructed him to "stop moving" and "turn around" [Id. ¶ 52].

Turner could not get a good enough grip on Williams to place him in handcuffs and as Williams moved to the other side of the room again, Turner tased him for a third time while yelling "stop moving" [Id. ¶¶ 53, 55]. Less than a minute elapsed between the first taser deployment and the third taser deployment [Doc. 128-9 at 11]. Turner

was then able to handcuff Williams while he was on the floor [Doc. 132-2 ¶ 56].

Soon after Williams was handcuffed, Douglas County Fire Department Paramedic Michele Waldrop ("Waldrop") arrived on the scene [Id. ¶ 59]. Waldrop did not believe medical personnel were able to get Williams' attention and observed Williams resist attempts by medical personnel and Turner to restrain him even after he was handcuffed [Id.; Doc. 132-17 at 1]. Plaintiffs do not dispute that Williams was at this time "thrashing his legs," and described Williams as attempting to do a type of pushup [Doc. 151 ¶ 66]. Additional backup units from the Douglas County Sheriff's Department arrived on the scene and relieved Turner [Doc. 132-2 ¶¶ 63, 66]. One of the additional deputies placed her right knee on Williams' shoulder because he continued to move his legs and was trying to roll over [Id. ¶ 66]. Waldrop administered 5 mg of Versed, a narcotic approved for treatment of seizures and behavioral conditions, intramuscularly into Williams' right shoulder [Doc. 134-2 ¶ 33]. She then administered another 5 mg, and Williams relaxed [Id. ¶ 34]. There is no dispute that up until this point Williams, whether voluntary or not, continued to move and remained at risk to harm himself [see Doc. 150 ¶ 33].

Shuler bound Williams' legs together and to keep them from thrashing [Doc. 132-2 ¶ 68]. Williams was belted to a stair chair for transport downstairs and then moved to a stretcher and taken to an ambulance; the handcuffs were removed prior to Williams being placed in the ambulance [Doc. 134-2 ¶ 35]. Williams was taken to WellStar Douglas Hospital, but later airlifted to WellStar Kennestone where he died [Id. ¶ 36].

After Williams died the Douglas County Sheriff's Office of Professional Standards conducted an internal force review led by Lieutenant John Sweat and found Turner's use of force to be legal, proper, and reasonable [Id. ¶ 80]. The Georgia Bureau of Investigation ("GBI") completed an independent investigation and concluded that the use of force was not criminal [Doc. 134-2 ¶ 45]. Plaintiffs believe the investigations were inadequate and based on missing or incorrect information and testimony from those who were on the scene [Doc. 128-4 ¶¶ 119-125].

The Douglas County Fire Department provides training and guidance to paramedics and other first responders on seizures, and both Shuler and Wardlaw received this training and regularly responded to seizure calls [Doc. 134-2 ¶¶ 38-39]. Shuler and Wardlaw had not witnessed another person behave as Williams did following a seizure, and Wardlaw testified that Williams did not present like a typical patient following a seizure [Id. ¶ 40].

## III. LAW ENFORCEMENT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Law Enforcement Defendants move for summary judgment on all claims asserted against them, which includes: Plaintiffs' federal claims for unreasonable search and seizure, excessive force, and failure to intervene; Monell liability and supervisory liability for deliberate indifference/failure to train; ADA and RA claims against the Law Enforcement Defendants in their official capacities (Sheriff Pounds and Turner in their official capacities); and state law claims for negligence, battery, false imprisonment, wanton conduct, intentional infliction of emotional distress, and respondeat superior against the Law Enforcement Defendants in their individual and official capacities. As already explained, summary judgment is

22

GRANTED for Turner and Miller on the <u>Monell</u>, supervisory liability, and ADA/RA claims asserted against them.

Defendants Turner, Miller and Pounds assert that they are entitled to summary judgment on Plaintiffs' Fourth and Fourteenth Amendment claims for unreasonable search and seizure, excessive force, and failure to intervene asserted against them in their individual capacities.   Defendants in their brief in support of summary judgment [Doc. 132-1] begin by stating that it is unclear if Plaintiffs are asserting procedural or substantive due process claims, but to the extent they are asserting procedural due process claims, those claims fail as a matter of law.   The Court agrees; to the extent any actions taken by the Law Enforcement Defendants deprived Williams of any constitutional right to procedural due process, there are adequate state remedies (for example, filing suit in this Court just as Plaintiffs have done).   Thus, Plaintiffs cannot show any constitutionally-inadequate process, and the Court will only discuss claims based on substantive due process going forward.   <u>See</u> <u>Arrington v. Helms</u>, 438 F.3d 1336, 1347 (11th Cir. 2006).   In terms of Plaintiffs' claims for violation of substantive due process, Turner and Miller assert they are entitled to qualified immunity. The Court agrees.

Qualified immunity is a defense that provides protection for government officials sued in their individual capacities so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).   Qualified immunity provides strong protection to government officials as a matter of public policy, and thus § 1983 does not exist to compensate a

plaintiff for every act by a government official that lacks an ideal level of professionalism or judgment.    Instead, allegations under § 1983 must be viewed in light of qualified immunity and its reasonableness standard.    To receive qualified immunity, a public official must first show that he was acting "'within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir. 1988)).

There is no dispute that Turner and Miller were acting within their discretionary authority at all times in this case.   The burden therefore shifts to Plaintiffs to show qualified immunity is not warranted under a two-part test.   Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1199 (11th Cir. 2007).    "First, the plaintiff must establish that the defendant violated a constitutional right."   Id. (citing McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007)). Second, Plaintiffs must show that the constitutional right was clearly established at the time of the violation.   Id. at 1199-1200.

## A.    Individual Capacity Claims

### 1.    Constitutional Violation

#### a.    Unreasonable Search and Seizure

It is again unclear on exactly what basis Plaintiffs assert a claim for unreasonable search.   First, to the extent this claim is asserted against Miller in his individual capacity, Miller was not present on the scene and had nothing to do with Turner's entry into Williams' house.    To the extent it is based on Deputy Turner's entrance into Plaintiffs' residence, this claim fails as a matter of law because Mrs. Williams called and asked for assistance.   Turner's entry into Williams' residence was with consent and for the purpose

24

of providing medical treatment, which negates the possibility of an unlawful search.  See Michigan v. Fisher, 558 U.S. 45 (2009) (holding that law enforcement may enter a house where officers reasonably believe someone is in need of medical treatment without running afoul of the Fourth Amendment).

The Law Enforcement Defendants interpreted Plaintiffs' claim for unreasonable seizure to be a claim for excessive force to effect a seizure based on Williams being briefly placed in handcuffs before being loaded into the ambulance.  The Court finds this to be the best interpretation of Plaintiffs' Complaint, but finds this claim also fails as a matter of law.  Once again the Court will not consider any claim against Miller in his individual capacity because he was not present when any seizure allegedly occurred.  The law prohibiting illegal seizures concerns unreasonable restrictions on a person's liberty, specifically in relation to the criminal justice system. Here, when the handcuffs were placed on Williams, they were not being used to restrain his liberties because he was being arrested or considered for criminal activity.  Instead, the firefighters and deputies on the scene were attempting to restrain Williams to protect him and begin administering medical treatment.

But even if the handcuffs were placed on Williams because he was a suspected criminal, Turner had reasonable suspicion to briefly detain Williams based on the totality of the circumstances.  When Turner arrived on the scene, even if he was told he was responding to an adult male who had a seizure, he evaluated the situation upon arrival.  Based on the human feces on the floor, blood, damage in the house, and Williams' inability or objective refusal to comply with commands, Turner was justified in having at the very least reasonable

suspicion that some criminality was afoot.   See Jackson v. Sauls, 206
F.3d 1156, 1165-66 (11th Cir. 2000)(explaining that reasonable
suspicion is a less demanding standard than probable cause and only
requires a minimal level of justification).  Thus, Plaintiffs' claims
for illegal search and seizure fail as a matter of law and summary
judgment is GRANTED for the Law Enforcement Defendants [Doc. 132] on
those claims.

### b.   Excessive Force

Plaintiffs assert claims for excessive force against all Law
Enforcement Defendants.  As Miller was not on the scene the day of
the incident, any excessive force claim against him fails as a matter
of law and the Court will not discuss it further.

Thus, the Court next considers the excessive force claim against
Turner.  A use of force is not excessive where the force used was
reasonable.    Graham v. Connor, 490 U.S. 386 (1989).    To assess
whether the force Turner used was reasonable, the Court examines:
"(1) the need for the application of force, (2) the relationship
between the need and amount of force used, and (3) the extent of the
injury inflicted."  Draper v. Reynolds, 369 F.3d 1270, 1277-78 (11th
Cir. 2004)(internal quotation marks, footnote and citation omitted).
The actions of an officer must be viewed from the "perspective of a
reasonable officer on the scene" and not based on hindsight, as
officers often must make quick decisions in uncertain circumstances.
See Beshers v. Harrison, 495 F.3d 1260, 1266 (11th Cir. 2007)
(internal quotation marks and citation omitted).    Reasonableness
therefore only concerns what actions are objectively reasonable based
on the facts and circumstances an officer confronted, regardless of
motivation or intention.    Graham, 490 U.S. at 397.    Importantly,

26

reasonableness in the constitutional context is a "pure question of law." Scott v. Harris, 550 U.S. 372, 381 n.8 (2007).

Here, the Law Enforcement Defendants argue the force applied by Turner was reasonable and proportionate to the need for force when considering the totality of the circumstances. The Court agrees. Importantly, this case does not involve a criminal arrest, and thus the Court's analysis does not fit perfectly with other cases regarding the use of force (and specifically a taser). But the thrust of the situation is that when Turner arrived at Williams' house, two medical responders had already been struggling to gain control of Williams so that they could begin to provide medical treatment. Turner immediately noticed the house was in disarray upstairs, and Williams was covered in bodily fluids and making a strange noise. Turner testified that he observed Williams push firefighter Shuler, but Plaintiffs dispute that and no other witness testified they saw the push. Even if Williams did not "push" Shuler, however, it is undisputed that Williams was walking around and not complying with Shuler or Wardlaw, who could not get Williams on the floor and to stay still to receive treatment. From an objective standpoint, Williams was resistant to medical assistance and presented an immediate threat to himself and a potential threat to anyone else on the scene.

Turner did use his taser shortly after arriving at Williams' house, but not before giving Williams warnings and chances to comply. Whether Williams was capable of complying is not the question--the question is whether to an objective officer Williams was resisting commands and creating danger to himself and others. Turner and Shuler attempted to subdue Williams without any use of force, but

27

could not get his hands behind his back because he was covered in various bodily fluids and was not wearing a shirt. Before tasing Williams the first time Turner warned "you are about to get tased!" before asking Williams to "turn around" again [Doc. 132-2 ¶ 40]. Williams did not comply, so Turner deployed his taser.   Turner deployed his taser a second time when Williams continued to move around, which from an objective standpoint appeared to be resistance.

Plaintiffs attempt to distinguish between active and passive resistance, but Williams' intentions (or incapability to form intentions) does not matter--what matters is Williams' behavior from an objective standpoint.   Before tasing him the second time Turner again requested Williams stop moving and again Williams did not comply.   Plaintiffs argue that at the very least the second use of the taser was objectively unreasonable because Williams was retreating from the officers.   However, Williams was still ignoring commands and presenting a danger to himself and others, and the medical personnel on scene could still not begin treatment because of Williams' movement.   But that was still not enough to subdue Williams to the point where medical assistance could be rendered. It is undisputed that even after the second taser deployment Williams waved his arms around and moved across the room against Turner's commands. In other words, from an objective standpoint, he continued to resist officer commands and assistance.

After instructing Williams again to stay still and attempting to grip Williams' body in vain, Turner deployed his taser for a third time.   Only after deploying his taser for a third time was Turner able to handcuff Williams, but even that was not enough to get Williams to stay still so that medical assistance could be rendered.

28

Once Williams was handcuffed paramedic Waldrop administered two doses of a sedative--only then was he able to be strapped to the stair chair and transported safety into the ambulance.

Plaintiffs argue that the taser manufacturer provides warnings against using a taser on someone with a known neurological disorder unless serious force is authorized, and in general a taser should only be used against someone *actively* resisting. Plaintiffs miss the point. To the objective observer Williams was actively resisting, and in any case, the taser was not used to stop Williams from resisting so that his liberties could be restrained because he was suspected of criminal activity. Quite the opposite--the taser was only used so that medical assistance could be rendered--which it promptly was once Williams was relaxed enough to be taken down the stairs.

Thus, here there was a clear need for the application of force. Before the use of any force Shuler and Wardlaw were unable to get Williams to stop moving so that medical assistance could begin. The use of force was proportional to the need for force as evidenced by the fact that it took three uses of the taser, the involvement of multiple officers and medical personnel, *and* the administration of a high dose of sedatives to get Williams to stop moving such that he could be transported to a hospital. Even if the taser caused Williams injury as Plaintiffs allege, that injury could not have been avoided because Williams resisted all other means of containment. Indeed any injury that may have resulted from Williams falling after feeling the shock of the taser was similar to the type of injury Williams continued to sustain in walking, slumping, and falling into objects around the bedrooms upstairs. The Court is sympathetic to

29

the fact that Williams, due to his medical condition, may not have had the capacity to comply with Turner's commands, but the question is only whether Turner had an objective justification for the use of force. Here, where bodily fluids were spread both on Williams and in the house and where two firefighters could not control Williams without the use of force, it was objectively reasonable for Turner to use non-deadly force to subdue Williams so that he could not hurt himself further.   Plaintiffs argue Williams was never in danger of falling over a bannister on the top floor, as Defendants argue Turner feared would occur if he did not deploy his taser, and was never violent toward any person on the scene.

Even if Plaintiffs are correct, however, that Williams was not in danger of falling over the bannister prior to the use of force, and even if no person present feared Williams would violently attack them, from an objective officer's standpoint, those were all reasonable fears of what could occur in the near future if Williams was not restrained and given prompt medical attention.   It was completely reasonable for Turner to fear what Williams would do next if allowed to roam through more of the house.  Traditional methods of containment (grabbing him, redirecting him, holding him on the floor, etc.) were clearly not working, and Plaintiffs do not dispute all present on the scene had trouble keeping Williams from moving.

The United States Court of Appeals for the Eleventh Circuit  has held that deploying a taser two times where a person refuses to comply with an officer's orders and is posing a danger to himself is reasonable.   In Buckley v. Haddock, 292 F. App'x 791 (11th Cir. 2008), a deputy sheriff stopped a motorist for speeding. Id. at 792. The motorist was homeless and became "agitated" about receiving a

30

ticket and began to sob. Id. The motorist then refused to sign the traffic citation, a legal requirement, even after the deputy warned the motorist that if he did not sign he would be arrested. Id. The motorist allowed himself to be handcuffed but then exited his vehicle, dropped to the ground, and continued to sob. Id. The deputy was concerned about the motorist getting hit by traffic on the nearby road and asked the motorist to stand up; he refused to comply. Id. After warning the motorist that a taser would be used if he did not comply and being unable to otherwise get the motorist off the ground, the officer deployed his taser two times. Id. at 792-93. The Court explained that some force is necessary when effectuating an arrest, and held that when considering the objective reasonableness of the deputy's actions, the deputy's actions were not "outside the range of reasonable conduct." Id. at 794.

In coming to its decision, the Buckley court considered the totality of the circumstances, and in particular that 1) the incident occurred at night on the side of a highway with traffic; 2) the deputy could not "truly control" the motorist because of his resistance; and 3) the deputy first tried to persuade the motorist to cease resisting and lift him off the ground without the use of force and gave the motorist time to comply. Id.

Here, just as is Buckley, when considering the totality of the circumstances, Turner's conduct was within the scope of reasonable conduct. Just as in Buckley, Williams' non-compliance created a danger to himself; Turner could not prior to his use of the taser three times "truly control" Williams; and Turner (and Shuler and Wardlaw before him) tried to get Williams under control using words and their hands but could not grab Williams and get him to stay still

31

so medical treatment could begin. Turner warned Williams he would be tased if he did not stay still, and Williams objectively did not comply. Thus, Turner's actions when considering the totality of the circumstances were within the realm of reasonable conduct.

Plaintiffs argue that even if one use of the taser was appropriate and reasonable, the second and third deployments surely were not because Williams was on the floor. Plaintiffs cite to Oliver v. Fiorino, 586 F.3d 898 (11th Cir. 2009) in support of this contention. Though there is some dispute about whether Williams remained on the floor after each taser deployment, it is undisputed he continued to move around. And even if he was on the floor, that does not automatically make the use of successive taser deployments unreasonable. Once again, the totality of the circumstances must be taken into account, and the Eleventh Circuit has specifically held the use of a taser can be reasonable even where a person is already in handcuffs on the floor. See Callwood v. Jones, 727 F. App'x 552, 559-60 (11th Cir. 2018) (finding that the point at which a suspect falls on the floor is relevant because it may suggest a suspect is no longer resisting, but it is not the "dividing point" between excessive and non-excessive force). In Callwood, the Court held that the important consideration is not whether the suspect is on the floor but whether he is "completely restrained or otherwise resisting arrest." Id.

Here, Williams was not under arrest--though a strong argument could be made that from an objective standpoint, there was probable cause to arrest him (while the original 911 call was for a seizure, from an objective standpoint it would not have been unreasonable for Turner to suspect drug use). But it does not matter whether Williams

32

was under arrest.  It was necessary to get Williams to stay still so that medical services could be rendered and he could be protected from further harm.  Even after he was on the floor he is described by witnesses as doing a type of one-armed pushup and got back on his feet; that type of continued resistance made the second and third uses of the taser objectively reasonable under the totality of the circumstances.

The question is not whether Williams was retreating or on the floor, but whether he was continuing to resist officer commands.  The clear answer is that he was.  Unlike in <u>Oliver</u>, where the suspect lay clenched on hot pavement as officers tased him more than five times, here Williams continued to move his arms and legs, making it impossible for those on the scene to get him in handcuffs or any other restraint and down the stairs before the taser was deployed three times.  The taser was only used as many times as were necessary to handcuff Williams and stop him from thrashing his extremities. Again, the taser was not for a law enforcement purpose (though it justifiably could have been).   Turner deployed his taser to immobilize Williams so that he could finally receive medical help.

The Sixth Circuit addressed this exact issue in <u>Estate of Hill v. Miracle</u>, 853 F.3d 306 (2017), a case in which a taser was used to subdue a "disoriented" and "combative" diabetic during a hypoglycemic episode so that paramedics could provide life-stabilizing treatment. <u>Hill</u>, 853 F.3d at 310.  Just as occurred here, a deputy in <u>Hill</u> arrived on the scene after paramedics had already been struggling to begin medical treatment.  <u>See</u> <u>id.</u>  The patient had ripped a catheter from his arm and kicked at paramedics as they tried to keep him from moving.  <u>Id.</u>  The deputy ordered the patient to relax, but when he

continued to swing his arms and kick the deputy warned the patient that he would deploy his taser. Id. The deputy then tased the patient, who immediately calmed down enough for medical treatment to continue. Id. at 311. Thus, just as in the case at hand, a taser was used not for a law enforcement purpose, but to subdue a disoriented person having a medical emergency and doing harm to himself. The use of a taser in Hill allowed medical treatment to proceed when words and other forms of lesser force were not working, and the same is true here. The Hill court explained that the usual analysis for excessive force when examining qualified immunity did not fit well with the facts because the diabetic patient was not accused of a crime. See id. at 313. The court elaborated that it did not make sense to examine common factors such as the severity of the crime at issue, the threat the suspect posed, or whether the suspect was actively resisting arrest because there was no crime or arrest. Id.

The Hill court then introduced a new test to use when the facts present a medical emergency situation where there is no direct threat to law enforcement, and it is not a crime or arrest situation. In a medical emergency situation, the Sixth Circuit held that a more tailored set of factors would include consideration of: 1) if the person was experiencing a medical emergency "that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others"; 2) if some degree of force was reasonably necessary to "ameliorate" the threat; and 3) if the force used was more than reasonably necessary under the circumstances. Id. at 314. The Hill court upon examining those factors found the answer to the first two questions to be yes

34

and the third question to be no--therefore the force used was not excessive.

This Court finds the factors for consideration offered by the Sixth Circuit to be well-reasoned and helpful to the ultimate question of whether Turner acted in an objectively reasonable way when considering the totality of the circumstances. Here, the answer to the first two questions is yes. There is no doubt that Williams was experiencing a medical emergency that rendered him incapable of rational decision-making, as testified to by multiple witnesses. At the same time, he posed an immediate threat to himself and if left free to move around, knock things over, and swing him arms and legs, could have become a threat to others even if unintended. Turner deployed his taser the number of times needed to handcuff Williams so that medical treatment could begin. In Hill, the patient became calm enough for medical treatment to proceed after a single use of the taser, but here, even after using his taser three times, Turner still had to physically struggle with Williams with backup assistance just so that Williams could be safely transported down the stairs.

The Court briefly notes that to the extent Plaintiffs base their excessive force claims on Turner's role in binding Williams' arms or legs and placing him on the stair chair or stretcher, there is no evidence those actions were unreasonable under the circumstances when there was no other obvious way to get Williams quickly and safely down the stairs and into the ambulance. Because Turner's actions were objectively reasonable, Plaintiffs' claim for excessive force against Turner in his individual capacity fails as a matter of law.

35

### c.   Failure to Intervene

The Court begins by GRANTING summary judgment for Miller in his individual capacity on Plaintiffs' claim for Failure to Intervene, as he was not on the scene when Turner used his taser on Williams.  With respect to Turner, the Court agrees with the Law Enforcement Defendants that there is no evidence Turner failed to intervene to prevent the excessive force of "others," as Plaintiffs allege in their Complaint [Doc. 1 ¶ 107].  An officer can be liable for failure to intervene when another officer uses force and he does nothing to stop it.  Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998). Here, the Law Enforcement Defendants assume that the only "others" the Complaint could be referring to are Wardlaw and Shuler.  The Court agrees.  As explained below, Wardlaw and Shuler did not use unconstitutional force, so there is nothing that occurred subject to which Turner should have intervened.  Moreover, there is no evidence Turner was in a position to intervene but failed to do so.  Any alleged excessive force Shuler and Wardlaw used either occurred with Turner's participation, or prior to Turner's arrival on the scene. There is simply no evidence Turner could have anticipated and stopped any alleged excessive force prior to his arrival.

### 2.   **Clearly Established Law**

As explained above, to overcome a defendant's qualified immunity, a plaintiff must establish that the defendant violated a constitutional right *and* that the constitutional right was clearly established at the time of the violation.  Here, Plaintiffs cannot prove as a matter of law that Miller or Turner in their individual capacities violated any constitutional right by using excessive force

36

or failing to intervene in another state actor's unconstitutional behavior. Thus, the Court need not discuss whether the rights Miller and Turner allegedly violated were clearly established because they did not violate any of Williams' constitutional rights.

However, for thoroughness' sake the Court notes that to the extent Turner (Miller who was not on the scene will not be discussed further) violated any of Williams' constitutional rights through the use of excessive force, there is no evidence that right was clearly established at the time of the incident. There is simply no case on point that establishes a bright line such that Turner should have been on clear notice that his use of the taser or assistance in binding Williams' arms or legs was unconstitutional. See Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000)(explaining that where there is no bright line rule, qualified immunity almost always serves to protect the defendant). A clearly established law is one that "every reasonable official" would know such that the constitutionality of the official's conduct is "beyond debate." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)(internal quotation marks and citations omitted). Here, Plaintiffs point to no law from the Supreme Court of the United States, the Georgia Supreme Court, or the Eleventh Circuit that clearly establishes that using a taser to subdue a person, who from an objective standpoint is making strange noises and moving his arms and legs while covered in bodily fluids and ignoring commands, is unconstitutional.

To be clear, the Court is not holding that the use of a taser during a medical emergency such as this is ideal, always appropriate, or should be encouraged. The Court here holds only that under the

37

particular facts of this case, Turner's use of the taser did not extend beyond the realm of reasonable conduct, and he did not have clear notice his actions were unconstitutional.

From an objective standpoint Williams presented outwardly as a person in need of serious medical help who was currently a danger to himself and could have been a danger to others. His medical condition appeared to be deteriorating and he was bleeding from the head when Turner arrived while other bodily fluids were spreading around the house. The first responders on the scene, Wardlaw and Shuler, could not immobilize Williams so he could receive medical treatment. In fact he resisted all attempts by Wardlaw, Shuler, and Turner to intervene prior to the use of the taser, and even after the third use of the taser continued to objectively resist help, even if subjectively Williams did not have control. It cannot be said in light of the totality of the circumstances Turner acted in violation of clearly established law and outside the realm of reasonableness.

The law does not serve to punish every officer who takes imperfect actions or even the wrong actions in hindsight. Instead, the law serves to allow a plaintiff to recover from a state actor (and overcome their qualified immunity) where they take action that is objectively unreasonable under the totality of circumstances and in violation of clearly established law any reasonable official would have been on notice of.

**B.    Entity Liability Claims**

**1.    Monell and Supervisory Liability**

Plaintiffs bring claims against Sheriff Pounds in his official capacity (substituted for Miller) for Monell liability and supervisory liability for deliberate indifference/failure to train

38

(Monell claims against Turner fail as a matter of law as explained above). Though Plaintiffs still appear to conflate claims against Douglas County and the Sheriff, the Court here emphasizes that the Sheriff is not liable for the actions of any employee of Douglas County (such as Wardlaw or Shuler) and vice versa. Plaintiffs split these claims into two counts, even though they overlap. Plaintiffs' Complaint [Doc. 1] says Claim III is for "Monell Liability," for failure to train and improper supervision, and Claim IV is for "Deliberate Indifference" for failure to train and supervise. The Law Enforcement Defendants address the claims for failure to supervise and failure to train separately, but both fall under the "Monell" claims umbrella. Thus, the Court will discuss both together now. Calling a claim a Monell claim is simply a short-hand way of asserting liability against a supervising entity, like the Douglas County Sheriff, based on the Supreme Court case of the same name. See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

As explained above, however, Turner did not violate Williams' constitutional rights. Thus, any clams against the Douglas County Sheriff in his official capacity (Sheriff Pounds) fail as a matter of law. Moreover, as explained by Defendants, for Monell liability, Plaintiffs must show there was a constitutional violation that resulted from a policy or custom which was the "moving force" behind the constitutional violation. Sheriff Pounds is not liable in his official capacity for the actions of his employees simply because he is their supervisor--a supervisor is only liable where he participates in the constitutional violation or there is a causal connection between the supervisor's actions and the violation.

39

Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007). Plaintiffs simply present no evidence of the sort.

A causal connection means 1) a history of widespread abuse that is enough to put a reasonable supervisor on notice of the need to correct an alleged deprivation, but he has failed to do so; 2) when a supervisor's custom or policy "results in deliberate indifference to constitutional rights"; or 3) when facts support an inference that a supervisor directed subordinates to deprive constitutional rights or knew they were acting to do so and failed to stop them. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

Plaintiffs argue in their response to the Law Enforcement Defendants' Motion for Summary Judgment [Doc. 153] that Turner had been removed from testifying in or handling DUI cases because he demonstrated a lack of understanding of the law, and thus Turner as a whole required close supervision which he did not receive. Turner's behavior or capabilities in DUI cases, however, are wholly irrelevant to whether the Douglas County Sheriff was on notice of widespread constitutional violations but chose to take no action. There is no evidence Turner was incapable of responding to other types of calls having nothing to do with suspected DUI.

Plaintiffs also make much of the fact that the Douglas County Sheriff's Office requires only an hour of training on mental disabilities. Plaintiffs argue this creates a question of fact as to whether a failure to train caused Turner to act unconstitutionally. However, Williams had no diagnosed mental illness, so that is irrelevant. And to the extent that the Douglas County Sheriff required little training on seizures, there is no evidence the amount of training was objectively inadequate and that the Sheriff should

have been on notice that additional training was needed. Plaintiffs state in their response to the Law Enforcement Defendants' motion for summary judgment that additional arguments can be found in their Motion for Partial Summary Judgment, but Plaintiffs cannot simply point the Court to various other filings in an attempt to disregard the Local Rules and their page limit requirements.   It is not the Court's responsibility to read a separate motion and simply guess the cases and arguments Plaintiffs mean to make in response to the Law Enforcement Defendants' summary judgment motion.

And while true that inadequate training can be a basis for municipal liability because it can show a deliberate indifference to a person's rights, there is no evidence here of a policy encouraging or allowing the use of tasers against those who have had seizures or other mental or physical disorders. Here, there is no doubt that the use of a taser on someone who has a physical impairment, such as a seizure, is not usually the best response or even an acceptable response.   But as explained above, Turner's actions were not unreasonable under the totality of the circumstances particular to this case, which was not a typical seizure emergency call. Moreover, even if Turner's actions did violate Williams' constitutional rights, there is no evidence Turner's actions were caused by a failure to train or that other officers were making similar decisions and violating similar rights.   In other words, there is no evidence any failure to train resulted in the "deliberate indifference" to the rights of Williams or other persons Turner and various Douglas County deputies would come in contact with.   See Gold v. City of Miami, 151 F.3d 1346, 1351-52 (11th Cir. 1998).   Plaintiffs point to no pattern of constitutional violations, and thus cannot prove Sheriff Pounds

41

was on notice of a need for additional training, but made the deliberate choice not to take action.

Broadly speaking, there is no evidence of a policy or custom that was the moving force behind an alleged violation. Plaintiffs present no evidence, for example, of similar incidents or responses. Even if the Court were to consider additional arguments contained in Plaintiffs' Motion for Partial Summary Judgment brief [Doc. 128-2] it would make no difference. Plaintiffs attempt to argue in that brief that the post-incident investigation completed by Lieutenant Sweat was flawed, evidencing a deliberate indifference to Williams' rights. Plaintiffs, however, make no effort to establish any causal connection between the post-incident investigation and a pattern of ratifying rights violations evidencing a deliberate indifference to the rights of Williams and other persons. Even if the particular investigation into Williams' death was flawed, there is no evidence the Sheriff had inadequate procedures as a whole for investigating post-incident complaints. Plaintiffs next argue that in terms of a failure to train, no pattern of similar incidents need be offered as evidence where it is "so obvious" there was a need for additional training and the lack of training was "so likely" to result in a violation of constitutional rights [Doc. 128-1 at 11-12]. Even if that is true, Plaintiffs present no evidence that the need for additional training on how to handle postictal seizure patients who become belligerent, which undisputedly is a relatively rare occurrence, was "so obvious."

Plaintiffs' final argument is that the poor post-incident investigation, in which Plaintiffs allege Sweat showed clear bias and took Turner at his word without further research, demonstrates a

42

deliberate indifference to unlawful activity, leading to the foreseeable consequence that citizens' rights would be violated. Plaintiffs argue that at the very least Sweat, and therefore the Sheriff, ratified Turner's conduct, which Plaintiffs argue is a viable theory for municipal liability. Even if it is a viable theory, here as already explained, Turner did not violate Williams' constitutional rights. Thus, the Sheriff did not ratify any unlawful conduct even if the post-incident investigation was flawed. Moreover, the Court emphasizes that none of these arguments were contained in Plaintiffs' response brief to the Law Enforcement Defendants' Motion for Summary Judgment.

In sum, Plaintiffs' claim for Monell supervisory liability fails because there is no evidence of a widespread policy or custom of allowing the constitutional rights of those who have had seizures or other impairments to be violated by the improper use of a taser, and Plaintiffs' claims for Monell liability/failure to train fail also because there is no evidence of widespread abuse such that the Sheriff should have been on notice of the need for additional training but deliberately chose to ignore that need. In other words, there is also no evidence of a causal connection between the actions or inactions of the Sheriff and any alleged violation of Williams' rights. Thus, summary judgment is GRANTED for Sheriff Pounds on all claims asserted against him.

### 2. ADA and RA Claims

Liability under the Rehabilitation Act ("RA") and Americans with Disabilities Act (ADA") is determined the same way, so the Court will only discuss the ADA. Additionally, this claim is against Sheriff Pounds in his official capacity only, as explained above. Title II

43

of the ADA, 42 U.S.C. § 1201 *et seq.*, prohibits a public entity from discriminating against a "qualified individual with a disability" because of the individual's disability. 42 U.S.C. § 12132.    As explained by the Law Enforcement Defendants, to prevail on a claim under Title II of the ADA, a plaintiff must prove 1) they are a qualified individual with a disability; 2) they were either excluded from participation or denied the benefits of a public entity's services or activities or were otherwise discriminated against by a public entity; and 3) the exclusion, denial of benefit or discrimination was because of the plaintiff's disability. Bircoll v. Miami-Dade Cty., 480 F.3d 1072, 1083 (11th Cir. 2007).

A plaintiff can make out a case for violation of the ADA based on intentional discrimination or a failure to reasonably accommodate. See Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001).    Here, Plaintiffs allege Williams was intentionally discriminated against because of his disability and was denied accommodation.    But as explained above, Williams was restrained not because he was suspected of criminal activity, but to protect him from the danger he was causing to himself and could have potentially caused to others.    The force used was reasonable under the circumstances, and was only used so that medical care for Williams could begin.    Williams was not arrested or seized because of his disability.    Instead, force was used and his hands and feet were bound so that he could be transported down the stairs.    He was restrained only to prevent further injury to himself.    Therefore it cannot be said any law enforcement officer from the Douglas County Sheriff's Department on the scene acted with the intention to violate or deliberate indifference to Williams' rights, and it certainly cannot be said any

44

violations of Williams' rights was *because of* his disability. See McCullum v. Orlando Reg'l Healthcare Sys., Inc., 768 F.3d 1135, 1146-47 (11th Cir. 2014) (explaining that to prevail on a claim for compensatory damages under the ADA plaintiff must show the defendant acted with discriminatory intent).

Any alleged discrimination was due solely to Williams' objective actions in resisting officer and medical personnel commands. Williams was not denied the benefits of a public service. The law enforcement officers on the scene worked to assist Williams, and even if that assistance was not perfectly rendered, Williams was not denied care or services.

Plaintiffs attempt to assert a failure to train theory as another potential way the Law Enforcement Defendants violated the ADA through intentional discrimination, but as the Court has already explained there is no evidence that a failure to train caused any harm to Williams or that the Sheriff was on notice additional training was needed on how to respond to seizure sufferers in the postictal state. Any failure to train that allegedly occurred in this case is not enough to show intentional discrimination, as is required for recovery under the ADA.

In terms of failure to accommodate, the duty to accommodate is not triggered until a request for accommodation is made. See Rylee v. Chapman, 316 F. App'x 901, 906 (11th Cir. 2009). Here, no specific request for an accommodation was ever made by Williams or his family. But even if a request were made or was not required, the Court also agrees with Defendants that in the chaos that confronted Turner upon arrival at Williams' house, it is unreasonable to expect him to have assessed Williams' medical condition (when he is not a

45

medical professional), determined what was necessary to protect Williams and his own safety, then modified that based on Williams' medical condition when it was wholly unclear at the time if that medical condition (a seizure) was even the cause of Williams' conduct. Thus, Plaintiffs' ADA and RA claims fail as a matter of law.

### C.    State Law Claims

Defendants assert they are entitled to summary judgment on Plaintiffs' state law claims for negligence, battery, false imprisonment, wanton conduct, intentional infliction of emotional distress, survival injury (theory of damages), wrongful death (theory of damages), and vicarious liability/respondeat superior/punitive liability. The Court agrees. As an initial matter, to the extent Plaintiffs bring state-law claims against Deputy Turner or Sheriff Pounds in their official capacities (redundant of each other), those Defendants are entitled to sovereign immunity. Sovereign immunity protects state government entities, including the Sheriff, from liability for tort claims under Georgia law unless the Georgia legislature provides for a waiver. See Grech v. Clayton Cty., Ga., 335 F.3d 1326, 1340 (11th Cir. 2003). No waiver is applicable here as the exercise of discretionary functions is at issue. See O.C.G.A. § 50-21-24 (2010).

To the extent Plaintiffs assert state law claims against the Law Enforcement Defendants in their individual capacities, they are entitled to official immunity. State law immunity principles govern pendent state law claims asserted under supplemental jurisdiction. See Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir. 1998) (explaining that "state law governs the applicability of immunity to

state law claims"). Under Georgia law, public officials and employees can only be subject to suit if they negligently perform their ministerial functions or if they act with malice or an intent to injure in the performance of their official functions. Gilbert v. Richardson, 264 Ga. 744, 753 (Ga. 1994). Thus, an officer's discretionary conduct is immunized even if negligent, as long as there is no actual malice.

As there is no dispute Defendants were performing their official functions and acting within their discretionary authority at the time of the incident, Plaintiffs must prove actual malice. Actual malice is a very high standard that cannot be inferred even if Williams suffered serious injury. Actual malice must be proven by specific facts that show an intent to injure or a deliberate intent to do wrong. See Adams v. Hazelwood, 271 Ga. 414, 414-15 (Ga. 1999). Plaintiffs present no evidence Turner acted with actual malice (Miller was not on the scene and certainly acted with no actual malice away from the scene, so the state law claims against him fail as a matter of law). Thus, Plaintiffs' state-law claims fail as a matter of law and summary judgment is GRANTED for the Law Enforcement Defendants on those claims.

In sum, summary judgment is GRANTED in full for the Law Enforcement Defendants on all claims asserted against them.

## IV. FIREFIGHTER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Firefighter Defendants Wardlaw and Douglas County move for summary judgment on all claims asserted against them, including Plaintiffs' Monell and supervisory liability for deliberate indifference/failure to train claims against Douglas County; ADA and RA claims against Douglas County; state law claims (described above)

47

against Douglas County; and Monell, supervisory liability, and unlawful search and seizure, excessive force, and failure to intervene claims against Wardlaw.  As explained above, summary judgment is GRANTED for Wardlaw on the Monell and supervisory liability claims asserted against him.

### A.   Entity Liability Claims

#### 1.   Monell and Supervisory Liability

As municipal liability does not stem simply from respondeat superior, a county's liability pursuant to § 1983 is limited to situations where the county has an official policy that causes a constitutional violation. Monell, 436 U.S. at 694.  That policy must be the "moving force" of the constitutional violation.  Id.  Here, Plaintiffs identify no official or unofficial policy that resulted in a deprivation of Williams' constitutional rights.  In other words, Plaintiffs offer no evidence of a direct causal link between Douglas County's action or inaction and any deprivation of federal rights Williams experienced.

Douglas County is not liable for any actions taken by the Sheriff or Turner, as explained in previous Orders of this Court [see Docs. 32; 103].  Thus, Plaintiffs must identify an official with policymaking authority for Douglas County who caused the alleged violation of Williams' rights.  Plaintiffs point to no such person. Plaintiffs' Monell claim against Douglas County therefore fails as a matter of law.

Plaintiffs in a separate count bring a claim against Douglas County based on failure to train/deliberate indifference, alleging that Douglas County's lack of training as to persons with epilepsy and other disabilities evidences a deliberate indifference to the

constitutional rights of Douglas County citizens [Doc. 1 ¶ 121]. But once again, Plaintiffs offer no evidence to support the contention that Douglas County knew of the need for additional training--here in the area of seizure response--and deliberately chose not to provide it. Because Plaintiffs offer no evidence of a widespread pattern of similar violations, Plaintiffs have failed to show there was an obvious need for additional training. See Gold, 151 F.3d at 1351.

Generalized claims about the need for additional training are not enough for Plaintiffs to meet their burden of creating a genuine issue of material fact as to whether Douglas County's failure to train its employees resulted in a deliberate indifference to Williams' rights. Instead, Plaintiffs must point to prior incidents that would have put Douglas County on notice of the need for additional training. They have failed to do so. It is not enough to say that Douglas County employees come across or interact with seizure patients on a regular basis. Instead, Plaintiffs must offer evidence of previous issues with Douglas County officials in responding to seizure patients, which would evidence that a lack of training is at issue. Thus, Plaintiffs' Monell liability claim for a pattern or custom of violating federal rights and supervisory liability claim for deliberate indifference due to a failure to train cannot proceed as a matter of law and summary judgment is GRANTED for the Firefighter Defendants on those claims.

### 2.    ADA and RA Claims

As already explained, to prevail on a claim under the ADA or RA, Plaintiffs must prove that 1) Williams was a qualified individual with a disability who 2) was excluded from participation in, or denied benefits of a public entity's services, or was otherwise

discriminated against, and 3) that exclusion or discrimination was because of his disability.   See 42 U.S.C. § 12132.

The Firefighter Defendants argue that to start, Williams was not a qualified individual with a disability.   It is undisputed that Williams was never diagnosed with epilepsy.   The 911 operator specifically asked Mrs. Williams if Williams had been diagnosed with epilepsy and she said he had not.   But even if Williams was a qualified individual with a disability, there is no evidence Williams was denied benefits or services by way of his disability.   Shuler and Wardlaw (and later Waldrop) arrived at Williams' house to provide assistance, and attempted to provide medical care quickly but had difficulties immobilizing Williams so treatment could begin.   As soon as Williams was still and it was safe they transported him by ambulance to the hospital.   Even if the actions taken by Shuler and Wardlaw were not compliant with best practices for handling a postictal seizure patient, there is no evidence they acted to intentionally discriminate against Williams or were deliberately indifferent to his rights, as is required to prevail on an ADA or RA claim.   Boynton v. City of Tallahassee, 650 F. App'x 654, 658 (11th Cir. 2016).   There is further no evidence they failed to accommodate Williams where no one made an accommodation request and Williams' own actions impeded any possible accommodation.

### 3.   State Law Claims

Just like the Sheriff, Douglas County is entitled to sovereign immunity on Plaintiffs' state-law claims because it is a department or agency of the state pursuant to the Georgia Constitution.   Ga. Const. Art. I § 2 ¶ 9(e).   See also Gilbert, 264 Ga. at 747 (explaining that a county is a department or agency of the state).

50

No waiver is applicable here as the exercise of discretionary functions is at issue. See O.C.G.A. § 50-21-24 (2010). Thus, the Court will not discuss the state law claims against Douglas County any further.

### B.    Claims Against Wardlaw

The only viable claims left against Wardlaw are federal law claims for unlawful search/seizure, and for excessive force and failure to intervene in violation of § 1983. For the same reasons the illegal search and seizure claims against Turner failed as a matter of law, these claims against Wardlaw fail as a matter of law. The Court will not discuss them further.

In terms of excessive force and failure to intervene, the same framework used to analyze those claims against Turner is applicable to those claims against Wardlaw. To overcome Wardlaw's qualified immunity, Plaintiffs must prove 1) Wardlaw violated a federal statutory or constitutional right and 2) the violation was clearly established at the time. Reichle v. Howards, 566 U.S. 658, 664 (2012). Here, Plaintiffs fail to do so.

### 1.    Constitutional Violation

#### a.    Excessive Force

It is unclear at what point Wardlaw is accused of using excessive force, but it appears to be when Wardlaw held Williams' legs as Wardlaw and Shuler attempted to immobilize Williams before backup from the Sheriff's Office arrived, or when Williams was allegedly tackled. Wardlaw, however, only held Williams legs so that he could receive medical treatment. As discussed above, even if holding Williams' legs was not the best way to restrain him so that he could receive medical treatment, or even if it violated Douglas

51

County policy, the question when considering a Fourth Amendment violation is whether Wardlaw's actions were objectively reasonable. Tennessee v. Garner, 471 U.S. 1 (1985). Here, there is no question of material fact as to whether Wardlaw's actions were reasonable. Williams could not receive medical treatment while moving around. From an objective first responder's point of view, Williams was a danger to himself and in need of transport to a proper medical facility, and that could not happen until he was immobilized and transported safely down the stairs. In other words, when considering the totality of the circumstances, Wardlaw's actions were reasonable. See Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002)(explaining that in deciding whether the amount of force used by an official is reasonable, the Court must consider whether a reasonable officer would believe that level of force necessary for the particular situation at hand).

Plaintiffs argue that Williams' son Auld saw him tackled onto the bed. Defendants, however, argue that Williams fell. Even if Williams was "tackled," however, there is no evidence what Auld observed was anything more than both Williams and Wardlaw falling together as Wardlaw tried to grab hold and keep Williams in one place so that medical treatment could begin. Moreover, after Williams fell, whether he was "tackled" or not, it is undisputed he got up and fell several more times, and had fallen even before the first responders' arrival onto the scene. There is clear and undisputed evidence Williams was a danger to himself who could not easily be controlled and immobilized. Wardlaw and Shuler assessed the situation upon arrival and observed Williams' lack of physical control over himself. They tried to use words before any physical

52

contact, but Williams did not comply.  Thus, it cannot be said it was unreasonable to physically hold Williams or use force to get him onto the floor.   Indeed it was because Williams was moving around uncontrollably that Mrs. Williams requested their son call 911 again to ask for help quickly.

Plaintiffs appear to argue a policy violation equals a constitutional violation, but that is not true.   For example, Plaintiffs argue Wardlaw used excessive force because he attempted to place Williams in a "Full Nelson" hold without first using his radio to contact medical control for advice or approval to use restraint, which Plaintiffs argue is the correct policy Wardlaw was supposed to follow.   That may indeed have been the policy in place.   But the question is whether the actions taken by Wardlaw were objectively reasonable even if in violation of policy.   The Court here finds Wardlaw did not act unreasonably in using force to restrain Williams so that medical treatment could begin.

### b.   Failure to Intervene

Plaintiffs argue that Wardlaw violated Williams' Fourth Amendment Rights by failing to intervene, because he did not seek to stop Shuler's use or force and did not "speak out" against the taserings, instead serving as a "conduit to the Taser device" [Doc. 153 at 6].   A failure to intervene claim cannot succeed, however, where there is no need to intervene because there was no constitutional violation to stop.   That is the case here.   Shuler, just like Wardlaw, only applied force so that Williams could be immobilized to prevent any further hazard to himself.   Shuler held Williams' legs and attempted to assist in handcuffing Williams, but did no more.   Shuler's use of force was proportional to the need

created by Williams, as evidenced by the fact that it took the use of the taser and sedatives to enable medical and law enforcement personnel to subdue Williams to the point he could be transferred to the ambulance. Moreover, Wardlaw is not a law enforcement officer and would not have known when it is appropriate to use a taser, but even if he did, Turner's use of the taser was not unconstitutional as a matter of law. Thus, Wardlaw did not fail to intervene.

### c. Deliberate Indifference

Plaintiffs did not make a deliberate indifference claim against Wardlaw in his individual capacity in their Complaint, and therefore the Court need not discuss this claim now. However because Plaintiffs mention it in their response to the Firefighter Defendants' summary judgment motion [Doc. 153] and the Firefighter Defendants reply to the argument made in Plaintiffs' response, the Court briefly discusses this issue. Plaintiffs argue Wardlaw violated Williams' Fourth Amendment rights through deliberate indifference to the risk of serious injury by restraining Williams while he was in the postictal phase of a seizure. Plaintiffs elaborate that Wardlaw was deliberately indifferent because he restrained Williams without physician approval or adequate personnel, and used an unlawful restraint technique with prohibited tools and methods. Plaintiffs further argue that use of the stair chair after Williams was restrained also showed deliberate indifference, as did Wardlaw's participation in the taserings [Doc. 153 at 7]. This is simply a repackaging of Plaintiffs' excessive force arguments. Even if Wardlaw violated policy, he was not deliberately indifferent to Williams' needs--just the opposite. Wardlaw tried to help Williams and contain the situation until backup arrived. Williams' own

54

actions, even if not done consciously, left Wardlaw with little choice.  Additionally, from an objective point of view it was not clear once Wardlaw arrived on the scene it was a seizure issue and not some other medical or mental-health emergency.

### 2.   Clearly Established

The Court need not discuss the second prong of the qualified immunity analysis as Plaintiffs cannot prove as a matter of law that Wardlaw violated Williams' rights.  However, even if Wardlaw did violate Williams' rights by using excessive force or failing to intervene, it cannot be said that the right was clearly established at the time of the incident.  Plaintiffs point to no similar case that would have put Wardlaw on notice that his actions were unconstitutional, and the conduct involved did not "so obviously violate the constitution that prior case law is unnecessary." Gains v. Wardynski, 871 F.3d 1203, 1208 (11th Cir. 2017) (internal quotation marks and citation omitted).  The facts here are unique and the circumstances uncommon--and when that happens qualified immunity almost always serves to protect the defendant.  See Priester, 208 F.3d at 926 (explaining that where the case law has not "staked out a bright line" on the factual terms in question the defendant almost always is protected by qualified immunity).

In sum, the claims against Wardlaw and Douglas County all fail as a matter of law, and summary judgment is GRANTED for the Firefighter Defendants in full.

### V.   PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT

Plaintiffs also filed a motion for summary judgment on some of the claims in this case.  Though Plaintiffs filed three different briefs in violation of the Local Rules and did not seek leave of the

Court for permission to go far over the page limit, the Court nonetheless has considered their motion in full. However, having granted Defendants' summary judgment motions, the Court now DENIES Plaintiffs' partial summary judgment motion and need not discuss it further.

## VI. CONCLUSION

In conclusion, Plaintiffs' Motion to Compel [Doc. 123] is DISMISSED AS MOOT. Plaintiffs' Partial Motion for Summary Judgment [Doc. 128] is DENIED. The Law Enforcement Defendants' Motion for Summary Judgment [Doc. 132] is GRANTED. The Firefighter Defendants' Motion for Summary Judgment [Doc. 134] is GRANTED. The Court STRIKES Plaintiffs' external media filing [see Doc. 135]. The Firefighter Defendants' Motion to File Supplemental Brief [Doc. 165] is GRANTED.

All claims having been adjudicated, the Clerk is hereby DIRECTED to enter judgment in favor of all Defendants. Costs are taxed to Plaintiffs.

SO ORDERED, this ___ day of September, 2018.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

56